**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jimmie Dale PHILLIPS, Defendant-Appellant.**

**No. 24485.**

United States Court of Appeals, Ninth Circuit.

June 2, 1970.

Tom O'Toole (argued), Tom Karas, Federal Public Defenders, Phoenix, Ariz., for appellant.

Lawrence Turoff (argued), Asst. U. S. Atty., Richard E. Burke, U. S. Atty., Phoenix, Ariz., for appellee.

Before BARNES, DUNIWAY and ELY, Circuit Judges.

BARNES, Circuit Judge:

On February 2, 1968, a national bank was robbed in Phoenix, Arizona, by an armed man, dressed in woman's clothes, wearing a wig, heavy pancake makeup and lipstick. On July 2, 1968, appellant was charged in two counts with robbery and armed robbery of a national bank, and on July 9th, 1968, he was indicted for it. After a not guilty plea, the trial court had an evidentiary hearing on the appellant's motion to suppress any "in-court" identification of appellant as the person who robbed the bank, based on the trilogy of 1967 cases (Wade v. United States, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199) and on Simmons v. United States, 390 U.S. 377, 88 S.C. 967, 19 L.Ed.2d 1247, decided in 1968.

The motion to suppress was denied, renewed at the trial which began on December 3, 1968, and again denied. At the conclusion of the Government's case a motion to dismiss on the same ground was made, and renewed after all evidence was in. Again each such motion was denied. Appellant was convicted on both counts, sentenced to ten years and takes this appeal.

Jurisdiction below rested on 18 U.S.C. § 3231; the statutes he was charged with violating were 18 U.S.C. § 2113(a) and (d). Jurisdiction of this appeal rests on 28 U.S.C. § 1291.

Two errors are urged: (1) the trial court's denial of the appellant's motion to dismiss, because of an unconstitutional line-up identification; (2) the denial of appellant's motion to acquit at the conclusion of the Government's case because of failure to prove the bank was insured with the Federal Deposit Insurance Corporation (hereinafter "F.D.I.C.").

I.

We consider the last point first. Appellant cites four cases, and appellee discusses the same four. None, as appellee states, "requires that proof that the bank deposits were federally insured be made only through the introduction of the certificate of insurance. These cases merely hold that such certificate was proof, but not the only acceptable method of proof." (Gov.Br. 14–15) That is true—but neither do they hold that the testimony here presented to establish this essential fact is sufficient to prove it, for in each case cited the bank's certificate *was* introduced in evidence. United States v. Bostic, 258 F.Supp. 977 at 978 (E.D.Penn.1966); Callahan v. United States, 367 F.2d 563 at 563 (9th Cir. 1966); United States v. Skiba, 271 F.2d 644 at 644–5 (7th Cir. 1959); Bayless v. United States, 147 F.2d 169 at 171 (8th Cir. 1945).

There is no question but that a proper showing that the bank was F.D.I.C. insured is an essential element of the crime charged. Hewitt v. United States, 110 F.2d 1 (8th Cir. 1940), and cases cited in n. 1, p. 5.

However, two of the four cases cited by both counsel solve our problem. We first note there is no evidence, testimonial or otherwise, in this case challenging the testimony of Walter Decker, operations manager of the bank, that the deposits of the bank were insured with the F.D.I.C. (R.T. 61). Therefore, "under such circumstances and for the purpose of this case it was not error to assume" the bank was so insured. (Skiba, *supra*, 271 F.2d p. 646) Furthermore, United States v. Bostic, *supra,* sets forth a different basis for the sufficiency of the reliability of the uncontested facts.

"Courts may take judicial notice of any fact 'capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy.' Uniform Rule of Evidence 9(2) (d) (1965). See also McCormick on Evidence, § 325 at 691 (1954); 4 Barron Federal Practice & Procedure, Criminal, § 2153, page 171 (Wright Cum.Supp. 1964); IX Wigmore on Evidence, § 2571 at page 548 (3rd ed. 1940)." *Id.,* 258 F.Supp. at 978. We find no merit in appellant's second contention.

## II.

Turning to the "line-up" issue, we note that United States v. Wade, *supra,* held that a defendant is entitled to the aid of counsel at any time a "critical stage" exists, such as a post-indict-ment line-up. This was a pre-indictment line-up,[1] but we find no different general rules apply between a pre-indictment and a post-indictment line-up. Each must be fair to the ultimate defendant. We hold the defendant was entitled to counsel at either, so as to promote and insure fairness at the confrontation, and a full hearing at the trial on the issue of identification.

But every line-up had without counsel does not require a reversal of a conviction, or the rejection of in-court identification by a witness to whom the accused was exhibited before trial, *if* it can be established that such evidence had an independent origin[2] or that error in its admission was harmless,[3] or both.[4]

In *Wade,* neither the line-up nor anything required of him therein violated Wade's Fifth Amendment right against self-incrimination. Specifically, in *Wade,* he was required to exhibit himself, and to speak. Using his voice thus as an identifying physical characteristic involved no compulsion of the accused to give evidence of a testimonial nature against himself. (*Wade, supra,* 388 U.S. pp. 221–223, 87 S.Ct. 1926.) Here, Phillips was required to wear a wig. *Cf.* Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).[5]

Because the Supreme Court could not determine from the record whether the court of appeals applied the prescribed rule of exclusion, or that the trial court had considered the nature of the in-court identification, the *Wade* case was remanded to the district court for the resolution of such issue.

In *Gilbert, supra,* the Supreme Court remanded the matter because Gilbert's

---

1. For the purpose of this case, we draw no distinction between a pre-indictment and post-indictment line-up. *Compare* People v. Palmer, 41 Ill.2d 571, 244 N.E.2d 173 (1969) and People v. Fowler, Cal.App., 76 Cal.Rptr. 1 (D.C.A. 1969). Rivers v. United States, 400 F.2d 935 (5th Cir. 1968); State v. Singleton, 253 La. 18, 215 So.2d 838 (1968); *Wade, supra,* 388 U.S. pp. 239–243, 87 S.Ct. 1926.

2. People v. Martin, 273 A.C.A. 724, 78 Cal.Rptr. 552 (D.C.A.1969).

3. *Wade, supra,* 388 U.S. pp. 239–243, 87 S.Ct. 1926; Thompson v. State, 451 P.2d 704 (Nev.1969); *Cf.* Martinez v. State, 437 S.W.2d 842 (Tex.Cr.App., 1969).

4. State v. Hicks, 455 P.2d 943 (Wash. 1969).

5. Holt was required to put on a jacket that fitted him.

counsel was not present at the line-up, and the trial court had not determined whether the in-court identification had been tainted by the illegal line-up procedure, or had an independent source or was harmless error. Counsel for Gilbert had asked for a hearing outside the jury's presence on the alleged illegality of the line-up, and this having been denied him—created a constitutional error.

Stovall v. Denno involved a one man show-up (or line-up) at the victim's hospital bed, and held only that the *Wade* and *Gilbert* constitutional rule was nonretroactive, thus denying Stovall relief.

In Simmons v. United States, *supra,* the facts are more closely parallel to those in the matter *sub judice.* In it, the Supreme Court taught that each case involving pretrial initial identification by photographs must be considered on its own facts, and convictions based on eyewitness' identification at trial, after such pretrial identification, will be set aside as prejudicial only if the pretrial identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

With these cases in mind we first note that here a hearing *was* had on appellant's motion to suppress the in-court identification. That hearing disclosed certain facts. As appellant states:

On Friday, February 2, 1968, in a 3–4 minute period (M.S. 134), at approximately 5:15 p. m., the 27th Avenue and Camelback Road branch office of the Arizona Bank, Phoenix, Arizona, was entered and robbed by a lone bandit attired in knee socks, skirt, sweatertype blouse with a female bustline, shoulder length blonde wig with bangs, lipstick and heavy pancake make-up. (M.S. 63, 104, 116, 134–35).[6]

"At gunpoint (M.S. 100), and in a gruff male voice (M.S. 89, 116, 126, 134) the bandit robbed a teller, Mrs. Theodora Warnken, of approximately $862.00. The bandit fled the bank and drove off with an accomplice who was in a car waiting in an adjacent parking lot. (M.S. 141)"

We then continue by quoting from appellee's statement of facts.[7]

---

**6.** Herein references to "R.T." are to Reporter's Transcript; to "M.S." or "M.S.T." are to motion to suppress transcript.

**7.** "On February 7th, 14th and 28th, 1969, Special Agent Lewis Fain, Federal Bureau of Investigation, showed witnesses Walter Decker and Theodora Warnken a series of twenty-nine individual photos and a sheet containing a number of small photos. A photo of the appellant was not among these and no identification was made (Government's Exhibits No. 2 and No. 4, and M.S.T. pp. 23 and 24).

"Subsequently, on March 7th and 8th, Walter Decker, Theodora Warnken, Dorothy MacLaughlin and Geraldine Smith were shown a series of nine pictures of men with wigs superimposed. A picture of the appellant was in this grouping. All four witnesses picked out the appellant's picture (Government's Exhibit No. 3; M.S.T. pp. 25–28).

"In addition to the nine photos shown to the witnesses, Mrs. Geraldine Smith was shown a profile of the appellant which she identified (M.S.T. pp. 26–28).

"On April 24, 1969, a lineup containing the appellant was conducted. All four of the above-named witnesses attended the lineup. Each witness testified that at the lineup, and without hesitating, he or she identified the appellant, that the identification was based upon the features and the build of the appellant in comparison with the man who held up the bank on February 2nd. These witnesses testified that the only photograph they identified was that of the appellant shown to them on March 7th and 8th, more than six weeks prior to the lineup (M.S.T. pp. 53 through 152).

"Witnesses Decker, MacLaughlin and Warnken testified that they saw the appellant from three to four minutes at a distance of from three to four feet. Mrs. Smith testified that she saw appellant as he passed in front of her as he passed the bank, that she was there with a group of Campfire Girls who were attempting to sell candy, that her girls stopped the appellant twice, once on the way in and once on the way out (M.S.T. pp. 54 to 55, and pp. 65 to 66).

"Each of the four identifying witnesses definitely identified the appellant in the courtroom as the man dressed in woman's clothing who had held up the bank

It was stipulated at the hearing the line-up was conducted without counsel for appellant present, and therefore that the Government had the burden to show by clear and convincing proof that the identification of the appellant at the trial was not tainted by the line-up.

After a full hearing, the court held there was no taint; denied the motion to suppress; and the matter proceeded to trial.

Appellant's brief devotes twenty-five pages to a detailed description of what the eye-witnesses testified to at the hearing on December 2, 1968, at the trial on December 4th and 5th, 1968, and what was stated to the F.B.I. by them at the pretrial showing of photographs on March 7th and 8th, 1968, and at the line-up of April 24th, 1968. Appellant urges that because:

(1) at the first pretrial showing of photographs there was no positive identification of appellant (though appellant was singled out as resembling the bandit);

(2) at the line-up one eye-witness positively identified the appellant and the other three tentatively identified him, being aided by voice identification, and appellant being the only one asked to speak;

(3) at the hearing and trial the four eye-witnesses positively identified the appellant as the armed robber;

these matters made his identification unfair, and tainted it.

(Mrs. Smith, M.S.T. p. 55; Mrs. Warnken, M.S.T. p. 88; Mrs. MacLaughlin, M.S.T. p. 115, and Mr. Decker, M.S.T. p. 132).

8. The court also said when ruling:
"The Court was particularly impressed with the testimony of the witnesses, even over and above the adroit leading on cross examination of counsel for the defendant, attempting to show that the line-up had something to do with the identification. The most that could be said of the line-up at all, it was a confirmation of an original impression acquired at the time the robbery took place.

We have read the testimony given at the motion to suppress and examined the photographs in evidence. We agree with the Government that there was nothing developed during the motion to suppress to indicate in any manner that the line-up was suggestive or unfair. The court held "that the government has sustained its burden by clear and convincing proof that the basis of the in-court identification is upon the observation of the respective witnesses, at the time of the robbery, of the defendant in this case." (M.S.T. p. 183)

The trial court could observe and measure the eye-witnesses, the F.B.I. employees and the defendant himself, as he testified at the motion to suppress. This is an advantage we do not, and cannot, have.

The trial court commented on how he had considered this factor (M.S.T. p. 183).[8]

We agree with the trial court, but whether we do or not, we find nothing in the record that requires us to reverse his judgment of the convincing value and substantial nature of the evidence before him. We affirm the appellant's conviction.

ELY, Circuit Judge (dissenting):

I respectfully dissent. Insidious lineup procedures were soundly condemned by the Supreme Court in the trilogy of 1967 cases cited by the majority (United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. Cali-

"The in-court identification today was based not upon the line-up, in this Court's opinion, from the evidence adduced here, but upon observations made at the time of the robbery.

"Certainly, under the cases today, a line-up should not be conducted without the presence of counsel. But regardless of that error, the Court is of the opinion that the in-court identification of the witnesses called at this hearing is based upon their impressions and recollections of the bank robber at the time of the robbery, at the time the robbery took place, the masquerade to the contrary notwithstanding." (R.T. pp. 183–184)

fornia, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.) Here, not only did the police construct a lineup so suggestive in its composition as to prejudice, gravely and severely, Phillips' right to a fair and impartial trial, they also denied him the right to have his counsel present when the lineup was conducted. In my opinion, reversal is compelled by *Stovall, supra,* since "the confrontation conducted in this case was so unnecessarily suggestive and conductive to irreparable mistaken identification that [Phillips] was denied due process of law," *Id.* at 301–302, 87 S.Ct. at 1972, and by *Wade, supra,* since Phillips' attorney was excluded from presence at the lineup and the prosecution failed "to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." *Id.,* 388 U.S. at 240, 87 S.Ct. at 1939.

I first reach the due process issue, since I would characterize the lineup technique under consideration as a travesty. The lineup was composed of Phillips and four others, each wearing a blonde female wig. To the suspect's left were three police officers, all wearing their regulation, dark blue police trousers, white undershirts which appear to be identical, and, presumably, regulation shoes. On Phillips' right was a newspaper man, clad in dark pants and a white dress shirt open at the neck. Phillips, dressed in a light colored jail uniform issued to all his fellow prisoners,[1] was made remarkably, and, I think, shockingly, conspicuous. In support of this opinion, I here include a photograph which was the Government's Exhibit No. 1 in the court below. While the original photograph, when reprinted, will doubtless lose some of its clear detail, it will yet, I think, dramatically reveal the essential unfairness of which Phillips was the victim and which, in the light of *Wade, Gilbert,* and *Stovall,* so sorely troubles me. Here is the picture.

[A1930]

<hr />

1. While the record does not contain direct testimony that Phillips was clothed in prison uniform during the lineup, I think it must have been obvious to the District Court, as it is to me, that he was. In his oral argument in our court, the Government's attorney conceded that Phillips was so garbed. He also conceded, with admirable forthrightness, that the lineup witnesses "probably" observed other prisoners in like uniform while proceeding to the place of the lineup.

The suggestion inherent in the above depicted lineup was especially prejudicial in this case, since the potential for improper influence was so very great. *See Wade, supra*, 388 U.S. at 233, 87 S.Ct. 1926. None of the four witnesses viewing the lineup had earlier been able positively to identify Phillips from pictures of him which had been previously shown to them by the interviewing government agent. Yet three of these witnesses had stated to the agent that they would be aided by an opportunity to view someone in person. While the agent could not recall whether the fourth witness stated that he would be aided by a lineup, the agent had gotten the impression "at one time or another in talking to these individuals, that they felt that they could make an identification" if they "physically saw the person." A lineup was arranged and the witnesses were told, in advance, that one of the men they would see was a "suspect".[2] In this context, the lineup which, as I see it, virtually informed the witnesses which man the police suspected as the culprit so clearly "undermined the reliability of the eyewitness identification as to violate due process." Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127, 1129, 22 L.Ed.2d 402 (1968); Stovall v. Denno, *supra*.

*Wade*; also should require reversal. The teaching of *Wade* is that it is reversible error to allow courtroom identifications by witnesses who have previously identified the defendant at a lineup conducted in the absence of counsel unless the prosecution establishes by "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification," *Id.*, 388 U.S. at 240, 87 S.Ct. at 1939, or that, "in any event, the introduction of the evidence was harmless error." *Id.*, 388 U.S. at 242, 87 S.Ct. at 1940. Here there is no contention, nor could there reasonably be, that the introduction of the eyewitness identifications was harmless. Instead, the majority relies on the trial court's finding that the prosecution overcame its burden with the requisite degree of proof. With all due deference to the District Court, and to my Brothers also, I nevertheless submit that the finding was clearly erroneous. If the in-court identification was not, as a matter of law, corrupted by the lineup procedure in this case, I can hardly conceive of a situation wherein we could hold that it was so corrupted.

Even though each of the witnesses testified that he was identifying the defendant on the basis of impressions created at the time of the crime, it must be remembered that "neither witnesses nor lineup participants are likely to be schooled in the detection of suggestive influences." *Wade, supra*, 388 U.S. at 230, 87 S.Ct. at 1934. In a case such as this, wherein "suggestive influences" were so clearly employed by the police, we are obliged to examine the record with the utmost care.

Of the four witnesses who viewed the crime, the only one who saw the suspect for a period of more than four minutes was Mrs. Smith, and she testified that she "didn't get a clear look" at him. This is not surprising. His features were obscured by a wig, heavy "pancake"

2. Although some of the witnesses were unsure at the time of trial whether they had been told prior to the lineup that one of the men they would see in the lineup was the suspect, the Government agent who conducted the lineup testified as follows:

"Q. (by the Assistant Federal Defender) And did you tell them what they were supposed to look for in the line-up?

"A. (by Agent Jack D. Morgan) No, other than the fact that I told them that the line-up was in connection with the investigation being conducted in connection with the robbery of February 2nd of the bank and that *we had developed a suspect which would be in the line-up*. The fact that there was a line-up, however, as I told you before, I told them was no indication that any one of the individuals in it was the subject; it was merely an investigative procedure.

"Q. But you did tell them that one of the suspects was a suspect?

"A. *I told them that one of the individuals would be a suspect, yes.*" (Emphasis added.)

makeup, lipstick, and, according to some accounts, padding under the woman's upper garment that he wore. As I reemphasize, each of the four was admittedly unable definitely to identify Phillips from photographs viewed five weeks after the robbery. And two of the four remained reluctant to identify him positively even after viewing the prejudicial lineup held approximately twelve weeks after the robbery! Not until the time of trial—which was conducted more than forty weeks after the crime—did all four become able to identify Phillips as the criminal. To me, this is utterly inexplicable except upon the basis of the prodding, suggestive, and improperly influential technique which Phillips' accusers employed.

Against the above background, the very practical question is whether it was humanly possible for each witness to have excluded from his mind the impression created by the corrupt lineup and to have based his in-court identification solely on his observation during the short period that elapsed while the heavily disguised robber was at the bank. Having in mind the very brief duration of the robbery, I note the Supreme Court's reminder that "the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest." *Wade, supra,* 388 U.S. at 229, 87 S.Ct. at 1933.

The testimony of one of the four eyewitnesses, one Decker, most clearly illustrates how the power of suggestion was illegally employed in this case:

"Q. [by the Assistant U.S. Attorney] : At that time when you viewed the line-up, Mr. Decker, did you make any identification of anyone?

"A. [Mr. Decker] : Yes. Number two was the logical person.

"Q. When you say 'logical,' what do you mean?

"A. The nearest that I could recollect as being—having the characteristics or facial features of the party." If, as seems apparent from this excerpt, Decker was attempting to select the man in the lineup that most closely resembled the robber rather than endeavoring honestly to determine whether any man in the lineup *was* the robber, his testimony illustrates how the police, perhaps preoccupied with the often difficult problem of accumulating proof, can suggest to a witness which one of a number of lined up individuals is particularly suspected of having committed the crime. *See Wade, supra,* 388 U.S. at 235, 87 S.Ct. 1926. Once a suggestion such as that here has been made, it is difficult for me to believe that a witness can cast it aside and base his in-court identification solely on a confrontation that occurred before the lineup. This is especially true in a case such as this, wherein the lineup procedure was employed to "crystallize the witness' identification of the defendant for future reference,", *Wade, supra,* 388 U.S. at 240, 87 S.Ct. at 1939, and wherein no eyewitness was able positively to identify the suspect from viewing the photographs of him which had been presented between the time of the crime and the time of the lineup.[3]

Though her testimony was not as revealing as Decker's the other witness who identified the defendant at the lineup also stated that the lineup had assisted her in making an identification.

I am at a loss to understand what prompted the prosecution to rely on the other two witnesses, neither of whom was

---

3. Decker's uncertainty, prior to the lineup as to the physical appearance of the robber, as well as the fact that the lineup "crystallize[d]" the identification is additionally shown by the following:

"Q. [by the Assistant Federal Defender] : Did you have some question in your mind, prior to the line-up, as to what the person actually looked like?

"A. [Mr. Decker] : Yes, due to the fact that the masquerade was quite evident.

"Q. But at the line-up, without the masquerade, you were able to come to a conclusion?

"A. Yes."

able positively to identify Phillips at the time of the lineup or, of course, identify him from his photograph which they had seen before. It is unclear, and I can only speculate, as to what "sparked" their memories in the twenty-eight week interim between the lineup and the trial. In any event, both gave indications that the lineup had assisted them in making up their minds. Mrs. Warnken stated that the lineup "helped" her to make an identification, and Mrs. Smith admitted that she reviewed her written impressions of the lineup before testifying at the hearing on Phillips' motion to suppress the contaminated evidence.

While I am in no position to question the sincerity of any of these witnesses, I deeply feel that their conclusions as to the experience which constituted the source of their in-court identifications must be analyzed and discounted in light of the Supreme Court's recognition of the subtle yet powerfully persuasive effect of "suggestive influences" such as those which were exerted here.

I would reverse.